The primary issue in this case concerns whether the government had probable cause to search my client's apartment. It's our position that upholding the warrant in this case would mean that the government could get a warrant to search the residence of any person who is caught with a false identification document on the premise, which is the premise they used here, that such people, like everyone else, tend to keep proof of their true identity in their homes. So if you consider the hypothetical of a 17-year-old kid buying alcohol with a fake ID, the government could, using the warrant in this case, get a warrant to search that person's home or his parent's home in order to find proof of his true identity. I'd like to turn to the paragraph that I'm referring to where the government makes its statement in the application for the warrant to support probable cause. And it's at paragraph 20, which is on page 31 of the excerpt. And here the agent says, Based on my training and experience, I know that persons who obtain fraudulent identification documents tend to retain and secure such items in their residences to keep them close at hand, not only because they're evidence of a crime, but also due to the time, effort, and expense involved in acquiring such documents. It is also my experience that usually hidden in the same premises are documents which have been issued in or relate to the person's true identity. So in other words, the government has arrested someone with false identification documents, and they have then found out where that person lives. And based on the fact that they found him with false identification documents, they want to look in his home for either false or true identification documents. We maintain that this is not state probable cause to get into this person's home. The reason is that there are no facts linking my client's criminal activity back to his residence. They arrest him. They find evidence on him. He essentially confesses to the crime, which is false statement in a passport application. Then they do some additional investigation, which is simply to find out where he lives. And having found that probable cause to arrest him, plus where he they know where he lives, they want to get inside of his home to find false and true identification documents. This essentially amounts to a profile, which is that, you know, people keep documents of their identity, false or true, inside their homes. And our position is that you can't use this kind of this profile to get into the this defendant's home, because there's no factual link back to the residence. And to the extent that you can even say that a profile is sort of is used in the case of drug dealers or in the cases dealing with child possession of child pornography, if you look at the facts of those cases, there's a trail of the crime back to the home. There's some observation. There's a mail delivery. There's some something in the facts of the case which actually trail the criminal activity back to the home. And here there is none. How about when they went to the lease office or whatever it is, the apartment or the office, and they got the file and they look in the file and they saw his photograph, which had a false identification in the file? Right. Doesn't that provide some link to that? It shows that he used a false identification to rent this apartment. I mean, pretty close to the apartment, though. It's close to the apartment, but I don't think it actually, I mean, it's close to the act of renting or paying rent. I'm not sure that it's close. It actually gets his activity inside the apartment. If I were to rent an apartment today using my driver's license, my driver's license is in that bag. I mean, it's not in the apartment, and I'm not sure that you actually get any of my criminal activity inside of the apartment by finding out that information. I mean, that information basically confirmed that the same person who looked like the person they arrested lived in the apartment, and I don't think it really tells you anything more. Assuming you can use a profile in the absence of a factual nexus back to the home, this profile shouldn't get you in. And I think here you can look to the case United States v. Weber, which is, again, a case that I alerted this Court to by a 28-J letter, and that was a child pornography case where the Court has a very detailed analysis of what might be an adequate profile in the absence of a factual nexus back into the home, and that profile has to have a foundation. It has to be very specific about the types of people who meet the profile, and it has to say very clearly that this person either meets that profile explicitly or is very similar to the people in the profile. And here, this profile, if we can even call it that, is so vague and generic that it doesn't tell you anything about this defendant. It doesn't really tell you anything about the crime, and it certainly doesn't tell you anything specific or fact-based about similar crimes, why the residence is going to be an important place. It's essentially boilerplate, although it's not really detailed, and you have the sense that it was just thrown into this affidavit and not actually drafted with this particular, with the facts of this case of the defendant in mind. And it really, the agent's statement, based on my training and experience, really adds nothing, because the affidavit, either in this paragraph or earlier in the paragraph or earlier in the affidavit, doesn't tell us anything about that training and experience or the kinds of investigations this person has done. And it doesn't really give the magistrate judge anything to hang on to in terms of the facts of this case, the reliability of this information and the basis for the profile. Can I change the top of the discussion for just one moment? Sure. There's the receipt for the rentals. Storage unit. Right. Yes. Now, the magistrate didn't address that issue, and it wasn't objected to in the objections to the report and recommendation that was presented to the district court judge. The receipt itself, the issue surrounding the receipt, whether or not it was outside the scope of the search warrant. Right. I think that it was — The magistrate didn't address that. Right, right. He addressed other items. Right. We did not address that in terms of whether it was outside the scope. Why not? I'm not sure. I think partly because at the district court level, they didn't — there wasn't a very large focus in terms of which particular documents were inside and outside of the scope. And the magistrate judge sort of in a cursory way, or not cursory, but in a very quick sort of a one-line way, says they could look at all of the documents. So that wasn't particularly challenged. Although, I do think that the probable cause to search the storage unit is very flimsy, and it really sort of even highlights more that the government is — exposes that the government is on a fishing expedition. They say, well, we think it's going to be in the residence, and then it's not in the residence. So they don't keep stuff like this in storage units, which means that maybe they didn't really have a very firm basis for believing that it was going to be one place or the other to begin with. They're just guessing. You often search both apartments and storage units if you know they were both. So it doesn't show much that they didn't know about the unit until they had the apartment. If they'd known about the storage unit, they would have gotten a warrant for both initially. Well, I'm not sure they could have — they should have gotten a warrant for either based on the statements — I mean, based on the probable cause statement that they make in the affidavit. No, no. That I understand. Right. Your basic argument is that they don't have it for either. But I'm saying it doesn't show that they were uncertain which it was in, because had they known about both, they would have gone for both to start with. Right. I understand. And then it's sort of just a chronological thing in terms of how they get from one to the other. Certainly that makes sense. But the probable cause we maintain is insufficient for both. And, I mean, it's very telling, I think, that the government — you know, the fact that the government was wrong — the agent was wrong, that he never found identity documents in either place. And you can tell from his affidavit that he's really referring not to bank statements but to identity documents in terms of a license or birth certificate, that kind of thing. It makes you question this very cursory profile, that maybe the profile isn't reliable. Maybe it's not really a very good profile at all, which is sort of our initial contention, that this kind of conclusory statement really doesn't say anything about these particular facts of this case that should get you into a residence. Thank you, counsel. I think I'm just going to reserve the remainder of my time. Thanks. That's about half a minute. Good morning. Gregory Dam, again, for the United States. I was the assistant United States attorney that handled this matter below. And this is the first time that I've heard the use of the word profile. Speak up. This is the first time that I've heard the use of the word profile with — in terms of this particular case. When the defendant was arrested, he was arrested on the basis that he was using the name Juan Aguirre Martinez and had obtained two passports in that name, one originally and then about a year later he claimed that he'd lost the first one and asked for a replacement passport in that name. Shortly thereafter, he asked that the name be changed from Martinez to Islam Ahmad Suleiman. That's what really got the State Department's attention, I suppose, is when this individual was asking to change his passport from a Hispanic name to a Middle Eastern name. And they looked at the passport application and then contacted this individual and they didn't know who he was at this time, but they said, your name change has been approved. You can pick it up at the post office in Las Vegas. The agents went to the post office. The time came and went for this individual to pick up his passport, and he didn't appear. They got tired of waiting and actually were leaving the post office building at the time this gentleman walked in the front door. They passed. And they observed him for a while and then approached him and asked him if he was indeed Mr. Martinez, and he indicated he was. Thereafter, they chatted with him in the post office building and asked him to fill out a form. He misspelled the name, his middle name, twice on this form. They then confronted him and said, we've talked to the real Martinez. We know who he is, and you're not Mr. Martinez. Well, between the initial contact with this individual and the execution of the search warrant to the court, to the investigating agents, to the State Department and his application for passports, we didn't know who this individual was when we searched the or sought the application for the search warrant for the apartment. We believed that this was the residence where he lived. And as the magistrate found in his initial order, in his opinion, it required only a moderate dose of common sense. What is that? A moderate dose of common sense. Yes. You know, I think I always hear people say use common sense, but for some reason or other, he had to say a moderate dose of common sense. And I wonder what the moderate dose is. It's not a full common sense, but just a moderate one. Not even a liberal amount of common sense. Yes. What do you think that amounts to? I don't know why he felt that it was a moderate dose as opposed to a healthy dose or a lesser dose. But the moderate could be not very much. Well, it was sufficient in his mind to support the issuance of the search warrant for the apartment. And I think there was good, very good reason to suspect that there would be evidence of this individual's either false identity or true identity in the apartment. It was interesting. When the agents executed the search warrant and did gain entrance to the apartment, they found an Expando folder, something akin to the one that I have here, and it was in the main folder, and they each contained a separate identity. I think there were 10 to 12 separate identities located in this one folder. And, of course, there was the receipt for the storage unit that was found that then resulted in the additional search warrant for the storage unit. The magistrate again found that, and he doesn't use the moderate dose of common ground, but he says, A view of the massive amount of fraud-related materials found in the defendant's apartment and the agent's observation that closet and storage space in the apartment was filled to capacity, the agent's educated opinion that additional such material may be found in the storage unit was clearly and rationally related to the facts as he knew them. All of that aside, and I would urge this Court to concur with the finding of the magistrate that there was indeed probable cause. The agents relied upon good faith on these warrants. These warrants were valid on their face. They were supported not only in their opinion by good cause, but by the United States Department of Justice that reviewed them and felt there was good cause. Kennedy, where's the evidence of that good faith? Where's the evidence of the good faith? The evidence of the good faith is contained within the affidavit. Who testified? Who testified before the district court, what officer, that I served this search warrant because I had good faith? Or somebody made that up, huh? Or was there testimony? No, there was no testimony at the suppression hearing. Somebody made it up. How can you make up good faith when you don't know whether or not he relied on good faith or not? The ---- How can I tell whether somebody's acting in good faith unless he tells me that based on what I did, I acted in good faith, and nobody testified to that? I think you can read the ---- I'm very sensitive to this because I was a judge that started Leon on this Court, and you know all about Leon. I'm afraid I don't. Well, that's a Supreme Court case about good faith. Oh, the ---- Leon. Yes, Leon. Okay. Yes. Yes, I do know all about Leon, of course. Maybe the officer looked at the warrant and said, you know, I know this warrant's no good, but so what? And if he came in and testified and said truthfully and said, I didn't care whether it was any good or not, then there wouldn't be good faith. If we look at the affidavits in support of all of these warrants, we can see that, in my opinion, that the officers acted in extremely good faith. We certainly wouldn't want to send the message to the police officers. I hate to repeat it, but who testified that the officer testified that he acted in good faith? There was no testimony. The same magistrate. There was no testimony at all. Now, who determined that there was good faith when nobody testified about good faith? The magistrate determined it. He made it up. He didn't make it up. He read the officer's mind. He read his own affidavit. The magistrate who issued the warrant was the same magistrate who held the suppression hearing. That magistrate listened to the agent when he came in and swore to the multiple search warrant applications in this case. I think he's certainly in the best position to determine whether or not there's good faith. He didn't decide the issue on good faith. He decided it upon probable cause. But I submit to the Court that there is indeed ample evidence of good faith simply by the actions taken by the investigating agents. The one issue that kind of intrigues me about this case, and I thought that I may have waived it until I read counsel's citation to the Takeda case in her reply brief, is standing. My recollection from law school standing is that a defendant in a situation like this is required to come in and say, that was my apartment, I lived there, and I have an expectation of good or an expectation of privacy, much as you, Judge Sotomayor, has a good faith. I'm asking, where's the evidence of standing? Certainly, we believed and felt that the defendant lived there, but you have to question whether or not a man's home is his ultimate abode of privacy? You have to question that? We didn't know who the man was. The home was not, was not, he gave six different names. His passport application was in the name of Juan Martinez. At the time he was arrested, there was another identity associated with him by the name of Roger Duque. You thought it was somebody else's house? It wasn't his house? You mean, you're telling me that the officer had a search warrant for somebody's house that he didn't know was the defendant's house? We didn't know who the defendant was. We thought that he lived there, certainly. Yes or no, please. Would you ask the question again, please? My question is, was a search warrant issued on a house that the officer who obtained the search warrant didn't know that that was the defendant's house? Yes, we believed it was the defendant's house. All right. Is that sufficient to raise a privacy? Not according to the case law of this case. The defendant's house is not his home? Certainly it is. But he has to say it's his home. He can't rely upon the government to prove it for him. Was his picture in the lease file? Yes. Yes, it was. That's one of the indices of probable cause that the agent relied upon. Pretty good evidence that that was his home. Well, certainly that he rented it. Well, that's all you need is to rent it. Okay. Your time is about up. You're not going to lose anything. Oh, yes, you're a minute over. Okay. And you're going downhill. Well, thank you. Thank you very much. Thank you. At least he leaves smiling. I'm not going to spend any time on standing. They found they used the key that they arrested him with that was in his pocket to actually open the door to the apartment. And as I say in my briefing, I think the government actually failed to object to a bad standing, to a standing ruling against them. On good faith, it's the government's burden to prove good faith. The magistrate didn't really make any kind of detailed finding. It notes in a footnote on page 257 of the record, of the excerpt, that the good faith doctrine might apply if the probable cause was insufficient. And I think this is exactly the kind of bare-bones affidavit that the Court, that should not justify a search based on good faith. And that's exactly sort of where the Court was in this Court was in Weber, where they found that the profile was bad and that it was actually unreasonable for them to make the warrant in the first place. I'm somewhat like Mr. Bort. What do you mean by profile here? Well, I guess profile is just a way for me to describe what they've done here, which is to make a very generic statement. You mean the showing? The showing of probable cause in paragraph 20 of the warrant is this. Too skimpy. Huh? Too skimpy? It's too skimpy. It says nothing about the facts of this case, the defendant in this case, a connection that makes you believe that there's any factual nexus back to the residence or in terms of his crime and the residence. And it gives you no, you know, it gives you no sort of analogy to other cases that would allow you to make that connection. That's what you mean by the profile. You mean the showing. The showing. I mean, the showing amounts to essentially a sort of very conclusory profile of the type of person who has a fraudulent identity document in his pocket has this kind of stuff in his home. I don't think that's enough to get you into someone's residence as a probable cause showing. At some level, it is sensible, but it's not enough for probable cause. It's a moderate amount of common sense. All right. Thank you. Is there such a thing as generic profiling versus specific profiling? And you're claiming this was generic profiling. Well, I'm claiming I don't think a profile is good enough, but I actually think the Weber case sets out an example of what might be specific enough. In the photography case, it was specific profiling. I'm sorry. In the photography case, it was specific. It was very specific. And in that case, it was not good enough. Here, there was nothing. There's nothing. There's no facts at all informing the profile to make it seem like it might be reliable. Exactly. Thank you. Thank you, Judge. The next case you're carrying is submitted. The next case is United States v. Williams. Hello again, Your Honor. It's Jason Carr, appearing on behalf of Appellant Nathan Williams. The other name in this caption is United States.
judges: Ferguson, Reinhardt, Paez